**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| REVA MEDICAL, INC., | Case No. 20-10072 (JTD) |
| Debtor.[1] | |

**DECLARATION OF JEFFREY ANDERSON IN SUPPORT OF CHAPTER 11 FILING**
**AND FIRST DAY PLEADINGS**

I, Jeffrey Anderson, hereby declare (this "Declaration") under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.      I am the President of REVA Medical, Inc. ("REVA," the "Company" or the "Debtor"), a corporation incorporated under the laws of the state of Delaware and the above-captioned debtor.  In my capacity as President, I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. I have been employed by REVA for a total of twelve (12) years, previously serving as Senior Vice President of Clinical and Regulatory Affairs between December 2013 and March 2019 and Vice President of Clinical and Regulatory Affairs since 2004.  I have over twenty-five (25) years of experience in the medical device industry.  In addition to REVA, I have held senior level positions at Neomend, Inc.; Abbott Vascular Inc.; Jomed Inc.; CRS Clinical Research Services and Medtronic plc. I received my Bachelor's degree in Physics from California State University at Fullerton.

2.      I am over the age of eighteen (18) and am authorized by the Debtor to submit this Declaration.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team,

---

[1]      The last four digits of the Debtor's tax identification number are (0505).  The Debtor's mailing address is 5751 Copley Drive, Suite B, San Diego, CA 92111.

the Debtor's employees or the Debtor's advisors, my review of the relevant documents and information concerning the Debtor's operations, financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

3.      I am generally familiar with the Debtor's day-to-day operations, business affairs, books and records, as well as the Debtor's restructuring efforts.  I submit this Declaration (a) to assist the Court and all parties in interest in understanding, among other things, the Debtor's operations, its corporate structure, and the circumstances that led to the commencement of this chapter 11 case and (b) in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on January 14, 2020 (the "Petition Date") and the relief that the Debtor requests from the Court pursuant to the motions and applications described in this Declaration (collectively, the "First Day Pleadings").

4.      To familiarize the Court with the Debtor and the relief sought in the First Day Pleadings filed in this chapter 11 case, this Declaration is organized into four parts as follows:

- **Part I** provides an introduction to the Debtor and information on its history, corporate structure and business operations;

- **Part II** provides an overview of the Debtor's capital structure;

- **Part III** provides a description of the circumstances leading to the commencement of this chapter 11 case, including a description of the Debtor's prepetition solicitation and restructuring efforts; and

- **Part IV** provides an overview of the relief requested in the First Day Pleadings and sets forth the relevant facts in support of each.

WEST\288940100.5

## I.   DESCRIPTION OF THE DEBTOR'S HISTORY, CORPORATE STRUCTURE AND BUSINESS OPERATIONS

### A.   The Corporate History and Corporate Structure of the Debtor

5.      REVA is a leading medical device company based in San Diego, California, focused on the development and commercialization of bioresorbable polymer technologies for three vascular applications – coronary artery disease, peripheral artery disease and embolization therapy.  Originally incorporated in California in 1998 under the name MD3, Inc., the Debtor changed its name to REVA Medical, Inc. in March 2002.  In October 2010, REVA reincorporated in Delaware.

6.      In 2007, REVA established a non-operating wholly owned subsidiary, REVA Germany GmbH ("REVA Germany") with the intention of further expanding into the German market.  Though REVA has held and continues to hold clinical trials and sell products in Germany, the expansion into the German market did not continue as originally planned.  REVA Germany has de minimis assets and liabilities and no operations.  REVA Germany is not a debtor in this chapter 11 case.

7.      In December 2010, REVA completed an initial public offering of its common stock in Australia and registered with the U.S. Securities and Exchange Commission.  The Clearing House Electronic Sub-register System ("CHESS") is a computer system that manages the settlement of transactions executed on the Australian Securities Exchange (the "ASX") and facilitates the paperless transfer of legal title to ASX quoted financial products. In order to be used directly for the transfer of certain financial products, the ASX developed a type of depositary receipt known as a CHESS Depositary Interest ("CDI"), which allows investors to obtain the economic benefits of foreign financial products and Australian Government Bonds without actually holding legal title to those financial products and enables investors to hold and transfer

3

interests in financial products electronically via CHESS.  Until early 2019, the Debtor's securities
traded in the form of CDIs.

8.      On or about February 19, 2019, the Australian Securities Exchange issued a market
announcement stating that the quotation and trading of REVA securities had been suspended at
the request of the Company in accordance with ASX Listing Rule 17.2 while REVA engaged in
negotiations with its debt and equity holders.  Shortly thereafter, REVA was delisted from the
ASX.  REVA's securities are not currently publicly traded.

9.      Initially, REVA was founded around a novel slide-and-lock design, creating metal
stents that did not deform upon expansion.  Since its founding, REVA has developed innovative,
implantable medical device technologies.  Throughout its twenty-year history, the Company has
developed nineteen (19) polymer families. REVA currently focuses on the development of
bioresorbable stents, called "scaffolds" because of their temporary nature, and bioresorbable
embolic microbeads.

**B.  The Products and Business Operations of the Debtor**

10.     As set forth above, REVA is a medical device company, which specializes in the
manufacture of medical devices known as bioresorbable polymer technologies for vascular
applications.  Its products fall into two broad businesses: bioresorbable scaffolds and bioresorbable
embolic microbeads.  REVA's products are unique in the market because they represent the ideal
balance of thinness and strength, with the distinct ease of use features including complete scaffold
visibility under x-ray, expansion with one continuous inflation, and no procedural time limitation.

11.     Generally, scaffolds are inserted into blood vessels in order to expand such vessel
and prevent blockage.  Similarly, bioresorbable scaffolds are used to restore blood flow, support
the artery through the healing process, then disappear from (or "resorb into") the body over a

4

period of time.  This resorption allows the return of natural movement and function of the artery, a result not attainable with permanent metal stents.  The advantage of resorption is that the bioresorbable stents will not cause an inflammatory response as foreign tissue often can.  Sales of bioresorbable scaffolds began outside the United States in 2012, following approval of Abbott Laboratories' ("Abbott") Absorb scaffold.  In subsequent years, other companies began obtaining approvals for developing and commercializing bioresorbable scaffolds.

12.    Embolization therapy works by blocking or obstructing blood vessels to restrict blood flow to certain tumors (both cancerous and non-cancerous) and wounds, providing a minimally invasive method for treatment.  REVA leverages its proprietary polymer technology to develop novel products for the field of embolization therapy and is currently in the pre-approval phase of developing bioresorbable embolic microbeads for embolic therapeutic purposes.

13.    On April 3, 2017, REVA received approval for the marketing and sale of its first bioresorbable scaffold product, which focused on the treatment of coronary artery disease – Fantom, in Europe and other jurisdictions that recognize the CE Mark.[2]  Prior to the issuance of the CE Mark, Fantom was implanted in 247 patients in the Fantom I and Fantom II clinical trials conducted in eight countries outside the United States. REVA used the six-month clinical results from 117 patients in the Fantom II clinical trial for CE Mark application, submitted in 2016. REVA received its first customer order late in the second quarter of 2017 and it recorded its first order shipments and revenues in the third quarter of 2017.

14.    Subsequently, the Debtor developed the Fantom Encore, a third generation coronary scaffold with thinner struts than Fantom.  REVA's Fantom and Fantom Encore scaffolds

---

[2]    The "CE Mark" evidences that a specific medical device product meets the essential European Medical Device Directives safety and performance requirements for medical devices in the European Union.  The CE Mark is a legal requirement to place a device on the market in the European Union.

WEST\288940100.5

are sirolimus-eluting bioresorbable scaffolds used to treat coronary artery disease in humans. REVA is currently selling Fantom Encore in Germany, Switzerland, Austria, the Netherlands, Belgium, Luxembourg, Italy and Turkey and is in the process of commercializing Fantom Encore in seven additional countries.

15.     In July 2018, REVA received CE Mark approval for MOTIV, a sirolimus-eluting bioresorbable scaffold intended for the treatment of below-the-knee peripheral artery disease.  While peripheral artery disease in the lower extremities is a large and growing medical issue, treatments options remain limited and many patients progress to amputation.  MOTIV was the first and only bioresorbable scaffold approved for below-the-knee revascularization therapy. Similar to Fantom and Fantom Encore, MOTIV has a thin strut profile and is x-ray visible. Currently, REVA's only bioresorbable scaffold products are the Fantom Encore and MOTIV.

16.     REVA markets and sells its products outside of the United States through distribution partnerships and direct-selling efforts.  Each of the distributors with which REVA has a partnership is a foreign corporation responsible for sales, marketing, customer training and support within their respective regions.  REVA works with each distributor on local regulatory registration and training for use of its products.

## II.     THE DEBTOR'S CAPITAL STRUCTURE

17.     As of the Petition Date, REVA had total assets of approximately $5.9 million on a net book basis.  The majority of REVA's assets relate to intellectual property, equipment and cash and cash equivalents. The Company's current liabilities totaled approximately $105.5 million as of Petition Date.  The Company's long-term liabilities total approximately $104.5 million, which includes $81.8 million in principal and approximately $22.7 million in accrued interest.  Amounts outstanding include $10.2 million under the Senior Secured Credit Agreement (defined below) of

$9.7 million plus approximately $500,000 in accrued interest, amounts outstanding on the 2014 Convertible Notes of $25 million plus approximately $11.1 million of accrued interest and amounts outstanding under the 2017 Convertible Notes of $47.1 million plus approximately $10.6 million in accrued interest.

### A.  Senior Secured Credit Facility

18.     On April 2, 2019, REVA entered into that certain Credit and Guaranty Agreement (as amended, modified, or otherwise supplemented from time to time, the "Senior Secured Credit Agreement," and the term loan facility contained therein, the "Senior Secured Credit Facility"), by and among REVA, as Company, various lenders from time to time party thereto (the "Senior Secured Lenders"), and Goldman Sachs International ("GSI"), as Administrative Agent, Collateral Agent and Lead Arranger (the "Senior Secured Facility Agent"), which provided term loans to the Company in the aggregate principal amount of $3.6 million (the "Senior Secured Term Loans"). The obligations under the Senior Secured Credit Facility are secured by first-priority liens on, and a first-priority security interest in, substantially all of the assets of REVA, aside from limited excluded assets.  The security interests are evidenced by pledge, security and guaranty agreements and other related agreements.  The Senior Secured Credit Facility was entered into with the requisite consent of holders of the 2014 Convertible Notes and 2017 Convertible Notes (each as defined below).

19.     On August 5, 2019, REVA entered into that certain First Amendment to Credit and Guaranty Agreement (the "First Amendment") by and among REVA, as Company, various lenders, GSI, as administrative agent for the lenders, and MS Pace LP and Senrigan Capital Group Limited ("Senrigan"), each as a new lender (the "New Lenders"), which First Amendment amended the Senior Secured Credit Agreement in various respects including to extend the maturity

7

date of the Senior Secured Term Loans. Pursuant to the First Amendment, the New Lenders made an additional $1.2 million available to REVA to satisfy its immediate funding needs. The First Amendment was entered into with the requisite consent of holders of the 2014 Convertible Notes and 2017 Convertible Notes.

20.     On December 3, 2019, REVA entered into that certain Second Amendment to Credit and Guaranty Agreement (the "Second Amendment") by and among REVA, as Company, GSI as administrative agent for the lenders, and Goldman Sachs Specialty Lending Group, L.P., as a new lender ("GSSLG"), which Second Amendment amended the Senior Secured Credit Agreement in various respects, including to extend the maturity date of the Senior Secured Term Loans. Pursuant to the Second Amendment, the lenders made an additional $500,000 available to REVA to satisfy its immediate funding needs and waived REVA's existing defaults under the Senior Secured Credit Facility. The Second Amendment also required REVA to establish an account controlled by a deposit account control agreement, where the cash proceeds from the Second Amendment and certain other revenues would be deposited. The Second Amendment was entered into with the requisite consent of holders of the 2014 Convertible Notes and 2017 Convertible Notes.

21.     On January 9, 2020, REVA entered into that certain Third Amendment to Credit and Guaranty Agreement (the "Third Amendment") by and among REVA, as Company, GSI as administrative agent for the lenders, and GSSLG, which Third Amendment amended the Senior Secured Credit Agreement in various respects. Pursuant to the Third Amendment, the lenders made an additional $4.4 million available to REVA to satisfy its immediate funding needs as well as to provide sufficient liquidity to consummate the restructuring transactions contemplated by the Plan. Additionally, the Third Amendment waived REVA's existing defaults under the Senior

Secured Credit Facility.  The Third Amendment was entered into with the requisite consent of holders of the 2014 Convertible Notes and 2017 Convertible Notes.  As of the Petition Date, approximately $9.7 million plus approximately $500,000 in accrued interest and fees remains outstanding.

### B.  Convertible Notes

22.    On September 24, 2014, REVA entered into that certain *Convertible Note Deed* by and between REVA, GSI and Senrigan (as amended, modified, or otherwise supplemented from time to time, the "2014 Convertible Note Deed").  In November of 2014, REVA issued 250 convertible notes (the "2014 Convertible Notes"), each with a face value of $100,000, for total gross cash proceeds of $25.0 million. The 2014 Convertible Notes are convertible at the holders' election into a total of 11,506,156 shares of common stock, which represents a conversion rate of $2.17275 per share.  The 2014 Convertible Notes matured on November 14, 2019.  Interest accrues on the 2014 Convertible Notes at the rate of 7.54 percent per annum, compounded annually, and is payable upon redemption or maturity.  Accrued interest is not payable or convertible upon conversion of the 2014 Convertible Notes.

23.    On April 22, 2017, REVA entered into that certain *Convertible Note Deed*, dated April 22, 2017, by and between REVA, GSI, Senrigan, Medtronic, Inc., HEC Master Fund LP, J.P. Morgan Securities plc, TIGA Trading Pty Ltd, and Saints Capital Everest, LP (as amended, modified, or otherwise supplemented from time to time, the "2017 Convertible Note Deed"), authorizing the issuance of two tranches of notes.  In May 2017, REVA issued 338 convertible notes and, in June 2017, REVA issued 133 convertible notes (collectively, the "2017 Convertible Notes" and, together with the 2014 Convertible Notes, the "Convertible Notes"), each with a face value of $100,000, for total gross cash proceeds of $47.1 million.  REVA used a portion of these

9

proceeds to repurchase 1,732,260 shares of common stock at $7.212 per share, for a total repurchase price of $12.5 million, and incurred transaction costs of $2.1 million, resulting in net proceeds of $32.6 million.  The 2017 Convertible Notes are convertible at any time at the holders' election.  The 2017 Convertible Notes mature five years from the issue date, if not converted or redeemed earlier.  Interest accrues at the rate of 8.0 percent per annum, compounded annually, and is payable upon redemption or maturity.  Accrued interest is not payable or convertible upon conversion of the notes.

24.     In connection with issuing the 2017 Convertible Notes, in May 2017 and June 2017, REVA issued warrants to purchase up to 2,119,500 shares of common stock to the buyers of the 2017 Convertible Notes.  The warrants were immediately exercisable and expire five years from issue date.  The exercise price of each warrant is $5.00 per share, which may increase depending on the price at which REVA issues securities in future financings, if any, to a maximum of $7.212 per share.

### C. Rutgers University License

25.     REVA licenses certain patents and other intellectual property rights related to the composition and coating of its bioresorbable scaffolds and REVA's other biomaterial products from Rutgers University (the "Rutgers University License").  REVA entered into an amendment to this license in July 2018.  Previously, the license required minimum annual royalties upon sales of products utilizing the licensed technology.  The amendment eliminated all minimum annual royalties (which could have eventually exceeded $2 million per year).  Under the amendment, the current royalty rate is less than five percent.  Upon a change in control of REVA, the royalty rate will reduce if and when certain revenue goals are attained.  Additionally, under the terms of the amended license, future milestone payments, payments due upon a sublicense of REVA's

10

technology and extension fees applicable to other indications have all been eliminated.  The accrual of $500,000 for extension fees as of June 30, 2018 was eliminated in the third quarter of 2018. The amended license increased the amount of payment REVA owes upon a change in control to $7.85 million plus 1% of the amount by which the purchase price to be paid at closing, net of debt repayment to creditors, exceeds $500 million, subject to a $10.0 million cap on the amount of the change in control payment.

26.     On or about November 3, 2019, REVA and Rutgers University entered into a further amendment to the license agreement, which amended the change of control provision contained in the license.  Under this amendment, a fee of 3% on any future transaction is required upon a change of control, but such fee will not be triggered by the transactions contemplated by the Restructuring Support Agreement and the Plan.  Additionally, REVA and Rutgers University continue to negotiate a potential cash buy out of the Rutgers University License.

### D.  Corporate Headquarters Lease

27.     REVA leases approximately 37,000 square feet of office and lab space for its corporate headquarters in San Diego, California. In October 2017, this lease was amended to extend the expiration date by 88 months from January 2018 to May 2025. Effective February 1, 2018, REVA's monthly rent became $66,000 and it will increase every February by three percent. The amended lease also contains a leasehold improvement allowance of $787,000, which was used on an upgrade to facilities completed in the third quarter of 2018, and rent abatements of $274,000. On September 24, 2019, the lease was amended to provide temporary relief of approximately $189,000 in past due rents, temporary relief from eviction actions by the landlord and reduced payments for a three-month period through December 2019.  The amended lease further provided

11

the landlord with a first priority security interest in substantially all of REVA's assets, excluding intellectual property.

### E.  Other Debt

28.     As of the Petition Date, REVA owes approximately $1.03 million in accounts payable to, among others, vendors, suppliers, and trade creditors, which it seeks authority to pay in the ordinary course as described further in the Trade Motion (defined below).  The Debtor also has regular and recurring compensation and benefit obligations of approximately $245,000 per month to its eighteen employees, for whom REVA seeks appropriate relief to pay in the ordinary course of business pursuant to the Employee Motion (defined below).

### III.     THE EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.  Mounting Liquidity Challenges

29.     REVA has incurred significant operating losses since inception and has relied on its ability to fund operations primarily through equity and debt financings.  The Debtor's business, like many medical device companies, is capital intensive.  Further, although REVA initiated commercial sales in the third quarter of 2017, Fantom is still very early in the commercialization stage.  During this stage, REVA has focused on educating physicians regarding the unique features of its products, continuing to publish results from its clinical trials and conducting and initiating additional clinical studies, including the commencement of its 1,500 patient post-market trial in May 2018, to build additional clinical evidence to support market adoption.  However, to date, REVA's products – Fantom, Fantom Encore and MOTIV – have seen relatively minimal sales levels and REVA has not yet generated revenue at a level sufficient to support its cost structure. Accordingly, since the first quarter of 2019, REVA entered into periodic interim financing

arrangements with the Senior Secured Lenders, as discussed above, to fund operations and debt service.

30.    In addition, the 2014 Convertible Notes matured in November 2019.  Each holder of the 2017 Convertible Notes holds a redemption right effective in November 2019.  On October 1, 2019, REVA received redemption notices from certain holders of the Convertible Notes, providing an irrevocable notice to the Company to redeem $25.5 million in outstanding Convertible Notes.  At the time, REVA did not have sufficient cash reserves to repay the amounts due on the Convertible Notes.

### B.  Abbott's withdraw from the Market and other Negative Publicity Related to Bioresorbable Scaffolds

31.    REVA's initial commercial launch plan for Fantom assumed it was bringing to market a second-generation product with better performance than the then-worldwide leading first generation product from Abbott, Absorb.  After REVA's launch of Fantom, however, in the face of adverse events and poor clinical trial results, Abbott withdrew Absorb from the market and the associated negative publicity related has severely impacted the market for bioresorbable scaffolds.

32.    Moreover, certain medical guidelines issued by the European Society of Cardiology ("ESC") in 2018 have forced REVA to alter its business strategies.  In August 2018, the ESC announced the publication of new ESC/European Association for Cardio-Thoracic Surgery guidelines on myocardial revascularization (the "2018 ESC Guidelines").  Generally, the ESC issues guidelines that summarize and evaluate all available evidence on a particular issue with the aim of assisting physicians in selecting the best management strategies for an individual patient with a given condition, taking into account the impact on outcome as well as the risk–benefit ratio of particular diagnostic or therapeutic means.

13

33.     The 2018 ESC Guidelines stated that the safety and efficacy profile of Abbott's Absorb (based on randomized trial data) as compared with contemporary drug-eluting stents in several trials as well as meta-analyses, "consistently indicate the inferior efficacy and safety of Absorb compared with contemporary drug-eluting stents during long-term follow-up," and that "bioresorbable scaffolds should not be used outside well-controlled clinical studies."

34.     In the 2018 ESC Guidelines, the ESC recommended that bioresorbable scaffolds have a Class III designation, which means that there is "evidence or general agreement that the given treatment or procedure is not useful/effective, and in some cases may be harmful."  As a result of the Absorb withdrawal in 2017 and the negative view on bioresorbable scaffolds contained in the 2018 ESC Guidelines, bioresorbable scaffold competition within the percutaneous coronary intervention stent market continued to diminish.  Companies with bioresorbable scaffolds made from the same polylactic acid polymer as Absorb have reduced their commercial efforts for such scaffolds. Although REVA has become a leader in the market, re-building the market for bioresorbable scaffolds has proven challenging.

### C.  Reduction in Force

35.     In response to the issuance of the 2018 ESC Guidelines and the related impact on REVA's business, REVA reduced its San Diego-based work force by eight (8) employees in November 18, 2018.  In February of 2019, in a further effort to right size its operations, REVA reduced its San Diego-based personnel to twenty-two (22) employees.  After a further reduction in headcount and as of the date hereof, REVA has seventeen (17) full time employees and one part time/temporary employee.

14

### D. The Restructuring Support Agreement, Plan of Reorganization and Disclosure Statement

36.     In light of its liquidity concerns, REVA began extensive, arm's-length negotiations with key stakeholders and creditors in February 2019.  Discussions initially resulted in the availability of short-term funding to infuse additional liquidity into the Debtor's business through the Senior Secured Credit Facility.  Negotiations with its key stakeholders continued through 2019 and, on December 23, 2019, the Debtor executed a restructuring support agreement (the "Restructuring Support Agreement") with GSI and certain of its affiliates, Senrigan Capital Management and affiliates of Elliott Management Corporation party thereto (collectively, the "Consenting Creditors"), which set forth the terms of a comprehensive restructuring to be implemented through a pre-packaged plan of reorganization and contemplated that REVA would file for chapter 11 relief to implement the restructuring transactions set forth in the Restructuring Support Agreement.

37.     Pursuant to the Restructuring Support Agreement, the Consenting Creditors have agreed, among others things, to support and take all reasonable actions necessary to consummate the Restructuring and the *Prepackaged Chapter 11 Plan of REVA Medical, Inc.* (the "Plan") in a timely manner, to timely vote all of their claims to accept the Plan, and to support and take all reasonable actions necessary to facilitate the solicitation of votes on the Plan, approval of the *Disclosure Statement for the Prepackaged Chapter 11 Plan of REVA Medical, Inc.* (the "Disclosure Statement"), and confirmation and consummation of the Plan.

38.     The transactions contemplated by the Restructuring Support Agreement and to be undertaken through this chapter 11 case provide for the Debtor to emerge from this chapter 11 case substantially de-levered with overall debt levels decreased by over $90 million.  The restructuring transactions also contemplate that all administrative claims, all priority claims, and the vast

15

majority of general unsecured creditors will be paid in full in the ordinary course of business or upon consummation of the Plan.  Through the Plan, the Senior Secured Lenders and holders of the Convertible Notes will receive equity interests in the reorganized Debtor and a new limited liability company created to continue the development and commercialization of REVA's bioresorbable polymer technologies for coronary artery disease and peripheral artery disease.

39.     I believe that the restructuring, embodied in the Restructuring Support Agreement and Plan, gives REVA the best opportunity to withstand current adverse industry conditions, maintain adequate liquidity for its operations going forward, avoid an enterprise-wide, piecemeal liquidation, and maximize value for the benefit of its stakeholders, all while positioning REVA for long-term growth.  I believe that the Debtor's negotiation of restructuring embodied in the Restructuring Support Agreement and the Plan represents a significant achievement against such a challenging market backdrop.

## IV.   OVERVIEW OF FIRST DAY RELIEF

40.     Contemporaneously with this Declaration, the Debtor has filed or expects to file a number of pleadings (the "First Day Pleadings") seeking orders granting various forms of relief intended to stabilize the Debtor's business, facilitate the efficient administration of this chapter 11 case, lessen the impact of the chapter 11 case on the Debtor's day-to-day operations and employees, and facilitate a successful reorganization of the Debtor.  I believe that this Court's approval of the relief requested in the First Day Pleadings is essential to avoid immediate and irreparable harm to the Debtor and its estate, to provide the Debtor with an opportunity to continue to meet its obligations in the ordinary course of business, to provide for a smooth transition into chapter 11 and to provide for the efficient and swift administration of this chapter 11 case.  A

WEST\288940100.5

description of the relief requested, and the facts supporting each of the First Day Pleadings, is briefly set forth below:

### A. Motion of the Debtor for the Entry of an Order Authorizing the Debtor to File Under Seal Portions of the Debtor's Consolidated Creditor Matrix Containing Certain Individual Creditor Information

41.     By the *Motion of the Debtor for the Entry of an Order Authorizing the Debtor to File Under Seal Portions of the Debtor's Consolidated Creditor Matrix Containing Certain Individual Creditor Information* (the "Motion to Seal"), the Debtor seeks entry of an order authorizing the Debtor to seal the portions of its creditor matrix that include its current and former employees' home addresses and other personally identifiable information.  I believe that publicly disclosing the home address of each individual current and former employee would create an undue risk of identity theft for the Debtor's employees. The benefit of public access to the Debtor's employees' home addresses is limited, if existent at all. Further, the address of the Debtor's headquarters in San Diego, California is readily available.  Accordingly, I believe that the privacy concerns at issue here warrant sealing the Debtor's employees home addresses on its creditor matrix and the Court should grant the Motion to Seal.

### B. Application of the Debtor for Entry of an Order Appointing Bankruptcy Management Solutions, Inc. d/b/a Stretto as Claims and Noticing Agent *Nunc pro Tunc* to the Petition Date

42.     Through the *Application of the Debtor for Entry of an Order Appointing Bankruptcy Management Solutions, Inc. d/b/a Stretto as Claims and Noticing Agent nunc pro tunc to the Petition Dat*e (the "Stretto Retention Application"), the Debtor seeks the appointment of Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto" or the "Claims Agent") as claims, noticing and voting agent for this chapter 11 case.  The Debtor selected Stretto after soliciting and reviewing proposed engagement terms from two other parties that have been approved by this Court to serve as claims and noticing agents.  As the claims, noticing and voting agent, Stretto

17

would assume full responsibility for the distribution of statutory notices to creditors and other parties in interest and to receive.  I believe that the appointment of Stretto will maximize the value of the Debtor's estate for all of its stakeholders and will help to facilitate the efficient administration of the chapter 11 case.  Accordingly, I respectfully submit that the Claims Agent Application should be approved.

### C. Motion of the Debtor for Interim and Final Orders Authorizing the Debtor to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business

43.     By the *Motion of the Debtor for Interim and Final Orders Authorizing the Debtor to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business* (the "Trade Motion") the Debtor requests authority to pay in full, in its discretion and in the ordinary course of business, undisputed prepetition claims of vendors and other creditors that provide goods or services related to the Debtor's operations up to $765,196.65 in the interim and up to $1.03 million following a final hearing on the Trade Motion.

44.     In the ordinary course of business, the Debtor's trade creditors provide critical services for the Debtor's businesses, including but not limited to providing finished goods and materials to use in the Debtor's manufacturing process; providing services and products related to research and development, and intellectual property protection, of products; transportation of the Debtor's products to customers; and providing services to assist in staffing, managing and processing various critical operational tasks, including accounting, operations, communications and other essential services.  The Debtor seeks authority to pay amounts as they come due and payable in the ordinary course of business and as set forth in the budget annexed to the Debtor's Cash Collateral Motion (as defined below).

45.     The Debtor negotiated the terms of the Plan with the goal of avoiding, among other things, disruption to the normal operations of the business by keeping the legal, equitable, and contractual rights of the vast majority of general unsecured creditors unimpaired, and quickly returning to business outside of bankruptcy.  Because the Plan contemplates payment in full on the effective date of the Plan of most general unsecured claims, I submit that relief sought in the Trade Motion is simply intended to advance the timing within which the Trade Claims (as defined in the Trade Motion) would otherwise be paid and to not change the remedies or amounts of such amounts, thereby minimizing disruption to the business.

46.     It is critical that the Debtor maintains strong relationships with its vendors and creditors given the nature of the Debtor's business.  Authority to pay the Trade Claims in the ordinary course of business is necessary to minimize disruption to the Debtor's operations and allow for a seamless transition through chapter 11.  Accordingly, I respectfully submit that the Trade Motion should be approved.

     **D.  Motion of the Debtor for Entry of an Order (i) Shortening Notice of, and Scheduling a Combined Hearing to Consider (a) Adequacy of the Disclosure Statement and Solicitation Procedures and (b) Confirmation of the Plan; (ii) Establishing Procedures for Objecting to the Disclosure Statement, Solicitation Procedures and Plan; (iii) Approving Form, Manner, and Sufficiency of Notice of Combined Hearing and Commencement of Chapter 11 Case; (iv) Extending Time, and upon Plan Confirmation, Waiving the Requirements to (a) Convene a Section 341 Meeting and (b) File Schedules of Assets and Liabilities and Statements of Financial Affairs; and (v) Granting Related Relief**

47.     By the *Motion of the Debtor for Entry of an Order (i) Shortening Notice of, and Scheduling a Combined Hearing to Consider (a) Adequacy of the Disclosure Statement and Solicitation Procedures and (b) Confirmation of the Plan; (ii) Establishing Procedures for Objecting to the Disclosure Statement, Solicitation Procedures and Plan; (iii) Approving Form, Manner, and Sufficiency of Notice of Combined Hearing and Commencement of Chapter 11 Case;*

19

*(iv) Extending Time, and upon Plan Confirmation, Waiving the Requirements to (a) Convene a Section 341 Meeting and (b) File Schedules of Assets and Liabilities and Statements of Financial Affairs; and (v) Granting Related Relief* (the "Scheduling Motion") (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan on shortened notice, (b) establishing a deadline to object to the adequacy of the Disclosure Statement and confirmation of the Plan, (c) approving the prepetition solicitation procedures, and (d) extending the time and conditionally waiving the requirements for the United States Trustee for the District of Delaware to convene a meeting of creditors under section 341(a) of the Bankruptcy Code and for the Debtor to file schedules of assets and liabilities and statements of financial affairs.

48.     In connection with the foregoing, the Debtor requests that the Court approve the following proposed dates and deadlines relevant to the solicitation of vote to approve or reject the Plan and the combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan:

| Event | Date |
| --- | --- |
| Voting Record Date | January 12, 2020 |
| Commencement of Solicitation | January 13, 2020 |
| Petition Date | January 14, 2020 |
| Voting Deadline | January 31, 2020 |
| Plan/Disclosure Statement Objection Deadline | On or around February 13, 2020 |
| Plan/Disclosure Statement Reply and Confirmation Brief Deadline | On or around February 17, 2020 |
| Combined Hearing | On or around February 18, 2020 |

49.     In accordance with the terms of the Restructuring Support Agreement, the Debtor commenced solicitation with respect to the Plan prior to the Petition Date, on January 13, 2020, by directing its voting agent, Stretto, to distribute the Disclosure Statement, Plan and the appropriate ballot to each of the holders of claims or equity interests entitled to vote to accept or

reject the Plan (collectively, the "Solicitation Package").  The Voting Deadline has been set for January 31, 2020 unless otherwise determined by the Debtor or as permitted by the Court.

50.     The Debtor requests to schedule the Combined Hearing with a slightly shortened notice schedule.  As set forth above, the Plan enjoys the support of all of those entitled to vote on the Plan and leaves many other creditors unimpaired.  Under the Restructuring Support Agreement, the Consenting Creditors have agreed to vote to approve and to take actions to consummate the Plan. I do not believe any creditors will be harmed by the shortened notice, because parties in interest will receive twenty-eight days' notice of the commencement of this case and the Combine Hearing before the deadline to object, affording them an opportunity to object and be heard with respect to the adequacy of the Disclosure Statement and confirmation of the Plan.

51.     The Debtor, however, has access to limited funds during the course of this chapter 11 case and will require access to the liquidity provided by the exit facilities to continue operations beyond February 17, 2020.  Further, the Restructuring Support Agreement requires the Debtor to consummate the Plan within forty-five days of the Petition Date.  Finally, minimizing disruption to the Debtor's customers, suppliers, vendors, and employees is crucial to optimizing the financial and operating performance of the Debtor and its business and operations going forward. Prolonging the chapter 11 risks creating unnecessary harm to the Debtor's business and, in particular, the Debtor's clinical trials, which take place in foreign countries with parties that may not be familiar with the U.S. chapter 11 process.  I believe scheduling the Combined Hearing on shortened notice is in the best interests of all parties in interest.

**E.  Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Continued Use of the Debtor's Cash Management System and Waiver of the Requirements of Section 345 of the Bankruptcy Code**

52.     Through the *Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Continued Use of the Debtor's Cash Management System and Waiver of the Requirements of Section 345 of the Bankruptcy Code* (the "Cash Management Motion"), the Debtor seeks authority (i)  to continue the use of its cash management system, including existing bank accounts and business forms; (ii) for banks to honor certain transfers and charge certain fees; (iii) to pay certain prepetition obligations and (iv) to waive certain requirements of the U.S. Department of Justice, Office of the United States Trustee.

53.     The Debtor's cash management system is comprised of three bank accounts (the "Bank Accounts"), which are maintained by Bank of America, N.A. ("Bank of America") and H.S.B.C. Bank, N.A. ("HSBC") and held by the Debtor.  REVA historically operated out of a single checking account.  In connection with entry into the Second Amendment, the Debtor established two bank accounts with HSBC.  The HSBC Bank Accounts serve as the Debtor's main operating account, into which the proceeds of the loan were deposited, and the Debtor's payroll account, into which the Debtor deposits amounts to fund payroll biweekly.  All revenues and payments are received through its cash management account, and the Debtor currently operates almost entirely out of the Bank Accounts with HSBC.

54.     The Debtor's cash management system allows the Debtor to control the administration of its Bank Accounts, oversee all cash receipt and disbursement activity, monitor all collections and manage liquidity requirements and facilitate the movement of funds in a timely and efficient manner, thereby reducing administrative costs.  From time to time, and in the ordinary course of business, the Debtor incurs obligations for the maintenance of the cash management

22

system, which primarily consist of fees owed to the bank for the maintenance of and services related to the bank accounts and amounts owed to GPS Capital Markets, Inc. on account of wires and foreign exchange transactions.

55.     Finally, the Debtor uses various business forms, such as checks, invoices, letterhead, and other business and marketing materials in the ordinary course of its business, which, because they were used prepetition, do not reference the Debtor's current status as a debtor in possession.  Requiring the Debtor to change existing business forms would unnecessarily distract the Debtor and its limited personnel from its restructuring efforts and impose needless expenses on the estate.

56.     Based on the above, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's transition through chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

> **F.   Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs and (II) Authorizing and Directing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations**

57.     By the *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs and (II) Authorizing and Directing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations* (the "Employee Motion"), the Debtor seeks authorization to pay prepetition employee wages, benefits, payroll taxes and other amounts required to be paid in accordance with the Debtor's fiduciary duties.

58.     As of the Petition Date, the Debtor has seventeen (17) full time employees and one (1) part time/temporary employee who work across the Debtor's main business units: administration, finance and accounting, manufacturing, research and development, and commercial/sales (collectively, the "Employees"), who work out of the Debtor's San Diego headquarters.   REVA pays approximately $125,000 biweekly in salary, benefits, payroll tax, 401(k) matching and other fees.   The Employees' skill, knowledge, and understanding with respect to the Debtor's operations, customer relations, and infrastructure are essential to maintaining the Debtor's business operations and will be equally essential during this chapter 11 case.   Moreover, just as the Debtor depends on the Employees to operate its business, those individuals also depend on the Debtor.

59.     In the ordinary course of business, the Debtor pays its Employees on a biweekly basis, in arrears, generally on Fridays.   Employees are salaried or paid hourly.   The Debtor's first postpetition scheduled payroll date is January 17, 2020, which will compensate Employees for prepetition and postpetition services.   The Debtor utilizes the services of Paychex, Inc. ("Paychex"), a third-party payroll administrator, to process its payroll and coordinate the remittance of withholding taxes and other obligations (as defined below).   From its HSBC account described above, the Debtor remits a lump sum payment into an account specified by Paychex, which Paychex then uses to fund payroll.

60.     In the ordinary course of business, the Debtor maintains various employment benefit plans and policies, including, without limitation, medical plans, dental plans, vision plans, life insurance plans, short term and long term disability plans, as described in the Employee Motion.   Employees who work forty (40) hours per week are eligible for all company-sponsored benefits.   Employees that work thirty (30) to less than forth (40) hours per week are eligible for all

company sponsored benefits, prorated based on actual number of hours worked. Employees that work less than 30 hours are eligible for paid time off and holiday pay, and can participate in the 401(k) plan if they meet certain minimum qualifications.

61.     Because the vast majority of Employees rely in large part, if not exclusively, on their compensation and benefits to pay their daily living expenses and support their families, these Employees and their families will be exposed to significant financial constraints if the Debtor is not permitted to pay accrued and owed, prepetition compensation. The Debtor seeks to minimize the personal hardship its Employees would suffer if the Debtor cannot honor these obligations. For the foregoing reasons, it is critical to the Debtor's business operations and its restructuring that the Debtor's workforce is paid amounts that remain due and owing and that the Debtor continues to honor its obligations to its workforce by paying payroll and providing benefits following the filing of this chapter 11 case.

62.     I believe that the Employees provide the Debtor with services critical to conduct the Debtor's business and services that will be critical to the Debtor's restructuring. I believe that absent the payment of the employee compensation and benefits owed to them, the Debtor's few Employees will abandon the Company, which will hinder the Debtor's ability to consummate the Plan and will devalue the Debtor's estate and increase instability during this critical time. Therefore, I respectfully submit that the relief requested in the Employee Wage Motion is a necessary and critical element of the Debtor's efforts and its reorganization.

### G.  Motion of the Debtor for Entry of Interim and Final Orders (i) Approving Notification and Hearing Procedures for Certain Transfers of Equity Securities, and (II) Granting Related Relief

63.     Pursuant to the *Motion of the Debtor for Entry of Interim and Final Orders (i) Approving Notification and Hearing Procedures for Certain Transfers of Equity Securities, and*

25

*(II) Granting Related Relief* (the "<u>NOL Motion</u>"), the Debtor seeks orders (i) approving certain notification and hearing procedures regarding the purchase, sale or transfer of equity securities in the Debtor, (b) directing that any purchase, sale, or other transfer of the equity securities in violation of such procedures is null and void *ab initio*, and (c) granting related relief.

64.     Generally, a company generates net operating losses if it has incurred more expenses than it has earned revenues in a tax year.  Subject to certain conditions, as discussed below, a company may apply, or "carry forward," net operating losses to reduce future tax payments in a tax year or years.  26 U.S.C. §§ 39, 172.  For net operating losses generated in tax years beginning before January 1, 2018 such "carry forward" may only reduce future tax payments up to twenty (20) years after the tax year in which the net operating losses were generated.

65.     Utilization of the net operating losses in future tax years may generate substantial cash savings from reduced taxes for a post-emergence company.  The net operating losses are of significant value to the Debtor and its estate because the Debtor can carry forward the net operating losses to offset future taxable income, thereby reducing future aggregate tax obligations.  As of the Petition Date, the Debtor had net operating losses of approximately $223 million.

66.     I understand that an ownership change may negatively impact utilization of the net operating losses.  Therefore, to maximize the use of the net operating losses and enhance recoveries for the Debtor's stakeholders, the Debtor seeks limited relief that will enable it to closely monitor transfers of the equity securities so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the net operating losses. I believe that the relief requested in the NOL Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor maximize creditor recoveries. Accordingly, I respectfully submit that the NOL Motion should be approved.

26

**H.  Motion of the Debtor for Approval of Agreed Order (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection, and (iii) Modifying the Automatic Stay to the Extent Necessary**

67.     By the *Motion of the Debtor for Approval of Agreed Order (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection, and (iii) Modifying the Automatic Stay to the Extent Necessary* (the "Cash Collateral Motion"),[3] the Debtor seeks entry of interim and final agreed orders (i) authorizing the Debtor to use cash collateral of Prepetition Secured Parties; (ii) providing adequate protection to GSI; (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Orders; and (iv) scheduling a final hearing..

68.     As described above, prior to the Petition Date the Debtor entered into the Senior Secured Credit Agreement (and with all ancillary documents, the "Loan Documents") with the Prepetition Secured Parties.  As of the date hereof, approximately $9.7 million in principal and $500,000 in accrued interest is due and owing under the Senior Secured Credit Facility.

69.     The Debtor's obligations under the Loan Documents (the "Prepetition Obligations") are secured by, among other things, first-priority liens in favor of the Prepetition Secured Properties (the "Prepetition First Priority Liens") in all of the Debtor's assets (the "Prepetition Collateral"), including all of the Debtor's inventory, intellectual property, accounts and accounts receivable, deposit accounts, contract rights and the proceeds of the foregoing, subject to certain customary exclusions and any other valid, perfected, and unavoidable lien or security interest otherwise existing as of the Petition Date that is senior to the security interest of the Prepetition Secured Parties (collectively, the "Permitted Prior Liens" and each a "Permitted Prior Lien").

---

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

WEST\288940100.5

70.     REVA historically operated out of a single checking account. In connection with entry into the Second Amendment, the Debtor established two bank accounts with HSBC, one of which is its main operating account, into which the proceeds of the loan were deposited, and the other of which serves as a payroll account into which the Debtor deposits amounts to fund payroll biweekly.   The Bank Accounts held with HSBC and the funds deposited therein constitute Prepetition Collateral.

71.     Prior to the Petition Date, the Debtor and its Senior Secured Lenders entered into arm's-length negotiations regarding the use of cash collateral.   The parties have reached an agreement with respect to the Debtor's use of cash collateral and the terms and conditions under which the cash collateral may be used by the Debtor, including that the Debtor may only use cash collateral in accordance with an approved budget, which may be modified from time to time upon agreement of the Debtor and Senior Secured Lenders.

72.     The Debtor cannot meet its ongoing obligations without its continued use of cash collateral because, other than the cash collateral, the Debtor does not have access to funds.   The Debtor will continue to generate limited revenue throughout the course of this chapter 11 case, which, for the avoidance of doubt, constitutes collateral under the Loan Documents under section 552(b)(1) of the Bankruptcy Code.   For the foregoing reasons, the Debtor's continued use of cash collateral is necessary to preserve the value of its estate and maximize its value for the benefit of all stakeholders.   Accordingly, on behalf of the Debtor, I believe that the Court should grant the Cash Collateral Motion.

*[Remainder of Page Intentionally Left Blank]*

28

I have reviewed each of the First Day Pleadings, the facts stated therein and the descriptions of the relief they request.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Pleadings and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

January 14, 2020

Jeffrey Anderson
President, REVA Medical, Inc.